IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KAITLIN LAMARR, Individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOSHEN HEALTH SYSTEM, INC., D/B/A GOSHEN HEALTH,<br><br>Defendant. | Civil Action No.: 1:23-cv-1173<br><br>**NOTICE OF REMOVAL** |

Defendant Goshen Health System, Inc., d/b/a Goshen Health (hereafter "Goshen" or "Defendant"), by and through undersigned counsel, hereby gives notice that this action, *Kaitlin Lamarr v. Goshen Health System,* Civ. No. 49D01-2305-PL-021530, is removed to this Court from the Indiana Commercial Court, Marion County, Indiana, pursuant to the federal officer removal statute.

**INTRODUCTION**

1. Plaintiff alleges that Goshen engaged in unlawful wiretapping and invaded her privacy by allegedly using the Meta Pixel and other tracking technology on Goshen's public website.

2. Because the conduct challenged by Plaintiff was undertaken pursuant to the federal government's extensive efforts to build a nationwide health information technology infrastructure over the past two decades, this case is removable under the Federal Officer Removal statute. 28 U.S.C. § 1442(a)(1).

3. In similar circumstances, other courts have held that removal is proper under the federal officer removal statute. *See Doe I v. UPMC*, No. 20-cv-359, 2020 WL

1

4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 20-cv-1581, 2020 WL 7705627, at *2–3 (N.D. Ohio Oct. 30, 2020). In support of removal, Goshen provides the following "short and plain statement of the grounds for removal" pursuant to 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

4. On May 26, 2023, Plaintiff Kaitlin Lamarr filed this action in the Marion County Superior Court 1 (Commercial Court) of Indiana.

5. Plaintiff alleges that Defendant Goshen "is an Indiana-based, regional healthcare with a 110 year history" that operates "healthcare clinics across four counties," as well as "the Goshen Hospital and the Goshen physician network of family medicine and specialty providers." Compl. ¶ 4.

6. Plaintiff also alleges that Goshen is a "massive and trusted healthcare provider" that "operates nearly forty other clinics" and "its own network of physicians who offer medical care across a broad range of specialties." *Id.* at ¶¶ 6, 34-35.

7. According to Plaintiff, "Goshen Health serves many of its patients through its Website and Online Platforms" and "encourages its patients to use its Online Platforms to search for physicians, locate healthcare facilities, learn about specific health conditions and treatment options, pay bills, sign up for classes and events and more." *Id.* at ¶ 36.

8. Plaintiff further alleges that she was a patient who "received healthcare services from Goshen Health clinics and physicians" and that she "relied on Goshen's Health Online Platforms to communicate confidential patient information." *Id.* at ¶ 86.

9. Plaintiff alleges that Goshen "knowingly configured and implemented into its Website devices known as 'pixels,' which then collected and transmitted patients information to third parties." *Id.* at ¶ 6. According to Plaintiff, one of the pixels Goshen

embedded into its website was the "Facebook Pixel (also referred to as the 'Meta Pixel' or 'Pixel.'")." *Id.* at ¶ 9.

10. Plaintiff further alleges that in addition to Goshen's use of the Meta Pixel, "Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI")," and that "if an entity implemented the Meta Pixel in in [sic] accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website" *Id.* at ¶¶ 11, 62.

11. Plaintiff alleges that the conduct described above resulted in Goshen disclosing private information to third parties like Facebook and Google, among others. *Id.* at ¶ 21.

12. Despite Plaintiff's conclusory allegations, the allegedly transmitted information is not PHI connected to a person's actual name, but instead consists of Internet-related metadata that enables the website to function, such as a webpage's Universal Resource Locator (URL), button clicks, and images. *Id.* at ¶¶ 42, 54.

13. Nonetheless, Plaintiff asserts claims against Goshen for:

    a. Negligence;

    b. Invasion of Privacy;

    c. Breach of Implied Contract;

    d. Unjust Enrichment;

    e. Breach of Fiduciary Duty;

    f. Violation of the Indiana Deceptive Consumer Sales Act; and

    g. Violation of the Indiana Wiretapping Act.

## VENUE

14. Removal to this District is proper because this Court embraces Marion

County, Indiana. 28 U.S.C. § 94(b).

## BASES FOR REMOVAL

15. Removal is proper under the federal officer removal statute.

16. The federal officer removal statute permits removal where the defendant is "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office . . . ." 28 U.S.C. § 1442(a)(1).

17. The United States Supreme Court has held that the federal officer removal statute is to be broadly construed to allow defendants to remove whenever they are acting under color of federal office. *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981); *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)); *see also Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (observing that the scope of the federal officer removal statute "is not narrow or limited").

18. Indeed, the Seventh Circuit has held that "[t]he presumption against removal in ordinary diversity jurisdiction cases do not extend to the federal officer removal statute" and has recognized that "the Supreme Court has made clear that courts must liberally construe § 1442(a)." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (citing *Hammer v. United States Dep't of Health & Human Servs.*, 905 F.3d 517, 526–27 (7th Cir. 2018); *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)).

19. "Federal officer removal is proper when the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Betzner*, 910 F. 3d at 1015 (citing *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 589–90 (7th Cir. 2016)).

20. In this case Plaintiff's claims relate to conduct undertaken by Goshen in furtherance of the federal government's Meaningful Use Program.

21. Since at least 2004, the federal government – through executive order, legislation, and regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology.

22. Specifically, the federal government has incentivized and directed providers (like Goshen) that participate in the Medicare and Medicaid program to offer patients online access to their records, and to optimize patient engagement with their medical information.

23. The federal government has also exhibited the behavior it wants to see by creating a portal for Medicare beneficiaries and working with the same third-party services with the same or similar "source code" at issue in this case.

24. Goshen has faithfully assisted and followed the federal government's direction in connection with the actions challenged by Plaintiff here. In so doing, Goshen has acted within the penumbra of federal action and office. Accordingly, pursuant to the Supreme Court and Seventh Circuit's directive that the statute must be liberally construed, and because this lawsuit challenges this federally-directed conduct, the requirements of the Federal Officer Removal statute are satisfied.

**A. The ONC Creates Nationwide Health Information Technology in Conjunction with Private Sector Through the Meaningful Use Program.**

25. In 2004, President Bush established a National Health Information Technology Coordinator (ONC). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to trigger a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id*.

5

26. In 2009, Congress codified the Office of the National Coordinator in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to the Centers for Medicare and Medicaid Services (CMS) to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.* at 246.

27. Congress also tasked the National Coordinator with, *inter alia*, "updat[ing] the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics with respect to": "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information" and "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A) (Strategic plan).

28. Consistent with its mandate, the ONC has published guidance for private providers to follow, including in five-year strategic plans. In the 2015–2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use."[1]

29. In the 2020–2025 plan, it noted that this has already happened, stating that "[f]ederal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare."[2]

---

[1] ONC, Federal Health Information Technology Strategic Plan 2015-2020, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf.
[2] ONC, Federal Health Information Technology Strategic Plan 2020-2025 available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf

30. One important aspect of this strategy is CMS's "Meaningful Use" program. 42 C.F.R. § 495.2–495.370; *see also* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 44314 (Jul. 28, 2010).

31. As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records. In introducing the final regulations, the agencies stated that "[c]ertified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321.

32. Under this program, providers must meet certain criteria to receive full Medicare reimbursement.

33. As part of the program, the federal government directed providers to create interoperable patient portals that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients the ability to view online, download, and transmit information about a hospital admission."); *see also* REBECCA MITCHELL COELIUS, *Get the Facts Regarding View, Download and Transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for ***access***, those in Stage 2 will attest for ***use***. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.").

34. The ONC has specified "how a patient portal helps achieve meaningful use

7

requirements," as well as how a provider can "actively promote and facilitate portal use" and how providers can optimize such portals – explaining that they "must be engaging and user-friendly."[3]

35.    The ONC has also issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

36.    Regulations require health care providers to attest to the National Coordinator and to CMS on their progress with respect to this criterion in particular. *See* 45 C.F.R. § 170.315(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3rd party the data specified below," including "[t]he Common [Meaningful Use] Data Set").

37.    Regulations also provide for incentive payments for providers who reached certain levels of engagement with electronic health record use through the patient portal. *See* 42 U.S.C. § 1395w-4(o) (incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic & Clinical Health (HITECH) Act*, at 2 CONG. RES. SERV. (Apr. 27, 2009) (discussing various financial incentives).

---

[3] ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at
https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

38. In addition to this guidance, CMS created its own portal, offering a model for private providers to follow.

39. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook.

40. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them.[4]

### B.   Goshen Is A "Person" Under 28 U.S.C. § 1442(a)(1).

41. By the plain terms of the statute, removal is permitted by "any **person** acting under [a federal] officer." 42 U.S.C. § 1442(a)(1) (emphasis added).

42. Consistent with the Supreme Court's command that the statute be construed broadly, organizations, corporate defendants, and government entities have routinely been deemed "persons" who can remove actions under the statute. *See, e.g.*, *Betzner*, 910 F.3d at 1015 ("Corporations are persons under § 1442(a), and so, Boeing has easily satisfied the 'person' requirement within the meaning of the federal officer removal statute.").

43. Because Goshen is a non-profit corporation, Compl. ¶ 30, it qualifies as a person who can remove under that statute.[5]

---

[4] *See generally* Medicare.gov Privacy Policy, available at https://www.medicaid.gov/privacy-policy/index.html (explaining that website users' "activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS) (last visited June 14, 2023).

[5] Defendant's status as a Domestic Non-Profit Corporation can also be verified on the Indiana Secretary of State's website, which is publicly available at: https://bsd.sos.in.gov/publicbusinesssearch.

### C. Goshen Acted Under a Federal Officer.

44. An entity is acting under a federal officer whenever it is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior" and is subject to "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007) (emphasis omitted). The phrase "acting under" includes "situations where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Betzner*, 910 F.3d at 1015 (quotations omitted).

45. To that end, the Federal Officer Removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

46. These requirements are met here because the federal government is incentivizing, regulating, monitoring, and supervising Goshen's actions in the Meaningful Use program to meet the federal government's national priority of interoperable health information technology.

47. First, Goshen (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information.

48. The federal government itself has repeatedly acknowledged the private sector's essential role in this project, most recently stating that the federal government and private sector "have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

49. Second, in the absence of Goshen's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to

10

complete its mission – and would likely do exactly that, as underscored by its efforts to digitize information and increase patient engagement with Medicare beneficiaries.

50. Third, the government has specified how to best enhance patient engagement, including through patient portals.

51. It has clarified how to generally design the portals and has told entities how best to market their online resources.

52. Furthermore, because the Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Goshen and comparable organizations not only to maintain public websites and/or patient portals, but also to achieve meaningful use of them. And, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

53. Finally, the government has created an office dedicated to this endeavor, closely monitored the work of private entities (like Goshen) and supervised the general development of this information technology infrastructure.

**D.  Plaintiff's Claims Are for or Relate to Acts Under Color of the Federal Office.**

54. Plaintiff directly challenges Goshen's website analytics practices, as well as its alleged tracking of online behaviors through source code and cookies and use of marketing companies such as Facebook to promote online patient engagement.

55. The Meaningful Use program envisions these activities, as evidenced by the federal government's own use of these codes and third parties for its Medicare website.

56. In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *See, e.g.*,

*UPMC*, 2020 WL 4381675, at *6 (holding that the UPMC's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at *2-3 (N.D. Ohio Oct. 30, 2020) ("Because [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

57. In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for Internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The *UPMC* court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *Id.* at *6 ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria."). The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id.*

58. Here, as in *UPMC*, "[t]here is plainly a connection or association between [Goshen's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and

usability." *Id.* at *6.

59. As shown above, Plaintiff's claims are therefore "for or relating to an act under color of federal office." *Id.* (internal quotations omitted)*; see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.") (citing *Maryland v. Soper (No. 1),* 270 U.S. 9, 30 (1926) (chauffeur assisting prohibition agents in distillery raid "has the same right to the benefit" of the federal officer removal statute as the agents); *Davis v. South Carolina,* 107 U.S. 597, 600 (1883) (permitting removal by Army corporal who assisted federal revenue officers in distillery raid)).

**E. Goshen Raises Colorable Federal Defenses to Plaintiff's Claims.**

60. The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar and requires only that the defendant make an assertion that is "defensive" and "based in federal law." *Mesa v. California*, 489 U.S. 121, 129–30 (1989).

61. A "colorable federal defense" need not be "clearly sustainable," but rather "need only be plausible." *Betzner,* 910 F.3d at 1014-15 (holding that "[j]urisdictional allegations control unless it is legally impossible for them to be true", that "a colorable federal defense under § 1442(a) need only be plausible", and that "at this point, we are concerned with who makes the ultimate determination, not what that determination will be.") (quotation omitted); *see also Willingham v. Morgan,* 395 U.S. 402, 407 (1969) (recognizing that a defendant invoking § 1442(a) "need not win his case before he can have it removed."); *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994) ("A federal defendant need not show that he is entitled to *prevail* in order to have access to the federal forum.").

62. By way of illustration and without limitation, Goshen has at least two colorable federal defenses to the claims at issue here that satisfy this requirement.

63. First, Plaintiff specifically refers to federal law – including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and guidance from the Department of Health and Human Services ("HHS") and the Office for Civil Rights ("OCR") – to describe Goshen's alleged duty of confidentiality involving PHI and to describe the scope of the PHI that allegedly was shared. *See* Compl. ¶¶ 1, 3, 100-107.

64. Thus, in response to Plaintiff's repeated claim that "protected health information" was disclosed, Goshen will argue that the information purportedly disclosed is outside of the purview of PHI protected by federal law.

65. In an analogous case against numerous health care providers, the United States District Court for the Northern District of California has held that the information identified by Plaintiff here is not PHI. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element.

66. Second, to the extent that they ever could allege a viable cause of action under Indiana law, Goshen will argue that federal law preempts Plaintiff's common law claims. *See UPMC*, 2020 WL 4381675 at *7 ("A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute.").

67. Finally, under Seventh Circuit precedent, "removal need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) (citations omitted).

68. Because each of the requirements of the Federal Officer Removal statute is satisfied, removal to this Court is proper. *See Betzner*, 910 F.3d at 1016 ("Because Boeing's allegations supporting its § 1442(a) notice of removal are plausible on their face, this case belongs in federal court.").

## REMOVAL PROCEDURES

69. Goshen timely files this Notice of Removal within thirty days of Goshen receiving the Complaint on June 5, 2023. 28 U.S.C. § 1446(b).

70. Goshen attaches a copy of "all process, pleadings, orders, and other documents" currently on file in the state court as **Exhibit A** hereto. *Id.* at § 1446(a). The attachments in the State Court Record, in chronological order, are as follows:

   a. Class Action Complaint and Jury Demand (with Exhibit A) (also attached separately as **Exhibit B** per local Rule 81-2(d));

   b. Appearance of Attorneys Lynn Toops, Amina Thomas, and Mary Kate Dugan for Plaintiff;

   c. Notice Identifying Commercial Court Docket Case;

   d. Summons to Defendant;

   e. Appearance of Attorneys Tyler Moorhead and Philip Zimmerly for Defendant;

   f. Defendant's Motion for Automatic Enlargement of Time to Answer or Otherwise Respond to the Complaint;

   g. Order Granting Automatic Extension of Time to Respond to Plaintiff's Complaint until July 26, 2023; and

   h. A copy of the state court docket sheet as of this filing date.

71. Pursuant to Local Rule 81-2, Goshen verifies that the attached state court record is complete as of the date of removal.

72. Goshen will promptly give written notice to all adverse parties and the clerk

of the Court of Marion County. *Id.* § 1446(d).

## CONCLUSION

For the forgoing reasons, Defendant Goshen hereby removes this action, *Kaitlin Lamarr v. Goshen Health System,* Civ. No. 49D01-2305-PL-021530 (Marion Superior Court 1 (Indiana Commercial Court)), to this Court pursuant to 28 U.S.C. § 1442.

Dated: July 5, 2023

BOSE MCKINNEY & EVANS LLP

/s/ *Tyler J. Moorhead*
Tyler J. Moorhead (34705-73)
Philip R. Zimmerly (30217-06)
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000
(317) 684-5173 (Fax)
TMOORHEAD@BOSELAW.COM
PZIMMERLY@BOSELAW.COM

BAKER & HOSTETLER LLP

Paul G. Karlsgodt (*Pro Hac Vice* to be filed)
Michelle R. Gomez (*Pro Hac Vice* to be filed)
1801 California Street, Ste. 4400
Denver, CO 80202
Tel: (303) 861-0600
Fax: (303) 861-7805
MGOMEZ@BAKERLAW.COM
PKARLSGODT@BAKERLAW.COM

*Attorneys for Defendant, Goshen Health System*

## **CERTIFICATE OF SERVICE**

      I certify that on July 5, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. I further certify that I also served all counsel of record via email.

Lynn A. Toops
Amina A. Thomas
Mary Kate Dugan
COHEN AND MALAD LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
ltoops@cohenandmalad.com
athomas@cohenandmalad.com
mdugan@cohenandmalad.com

                                                   /s/ *Tyler J. Moorhead*
                                                   Tyler J. Moorhead

4602196